Argued July 10, modified September 23, modified as to costs October 7, 1924.

# REGINALD C. COOLEY ET AL. *v.* J. A. HENDERSON ET AL.

### (228 Pac. 923.)

**Boundaries—Adjoining Owners can Fix Boundary Line by Agreement Followed by Occupancy Up to Agreed Line, for Ten Years.**

1. Adjoining owners can fix boundary line by agreement, though line so agreed on is not the true line, but, in order to effect the actual title without written conveyance, the agreement must be followed by acts of ownership up to the line agreed upon on each side, continued for ten years.

**Boundaries—Portion of Boundary may be Fixed by Agreement Followed by Occupancy, Leaving Remainder of Division Line to be Established by Survey.**

2. Adjoining owners fixing boundary line by agreement might carry it out by actual occupancy to agreed line, for part of distance, leaving remainder of division line to be established by legal survey.

**Boundaries—Fence not Essential to Location of Boundary by Agreement, Followed by Occupancy.**

3. A boundary line fixed by agreement, followed by occupancy, need not be marked by fence.

**Adverse Possession—Less Proof is Required to Establish Adverse Occupancy as to One Who Agrees Thereto.**

4. Less evidence is required to establish adverse occupancy as to one agreeing thereto, in fixing a boundary, than as to one who has no knowledge of its inception, or who does not consent thereto.

From Lane: J. W. HAMILTON, Judge.

Department 1.

MODIFIED.    MODIFIED AS TO COSTS.

For appellants there was a brief and oral arguments by *Mr. Fred E. Smith* and *Mr. Edward F. Bailey.*

Effect of compromise agreement locating division line at place known not to be the true boundary, see note in 10 L. R. A. (N. S.) 610.

See 2 C. J., § 61; 9 C. J., §§ 180, 182 (1926 Anno.).

For respondents there was a brief and oral argument by *Mr. Charles A. Hardy.*

BURNETT, J.—This is a suit to quiet title to three small tracts of land in the Donation Land Claim of William Wilson, No. 51, in township 16, south, range 5 west of Willamette meridian. The first of these tracts, designated for convenience as the "strip," contains three fourths of an acre; the second, called the "half-moon," contains one and one-fourth acres; and the third, called the "triangle," contains three fourths of an acre. The Wilson Donation Land Claim is a right-angled parallelogram dimensioned north and south 50 chains, and east and west, 64 chains. The geographical line dividing the claim into the north and south halves, and running due east and west will be called the "true line." At about 952 feet west of the east boundary of the claim, the Long Tom River flowing north and east impinges upon this true line; then curving to the south returns again and crosses the division line about 150 feet west of the east boundary, thus forming the half-moon in the bend of the stream south of the true line. The triangle is formed by the 150-foot segment of the true line above mentioned, as the base, the east line of the claim as the perpendicular, and the river cutting the division line and the east boundary of the claim north of the true line as the hypotenuse. The strip lies immediately south of the division line and west of the river, and the south boundary thereof is formed by beginning nine inches south of the northwest corner of the south half of the claim and running, with a variation of a few minutes at successive stations, south 89 degrees east, a distance of 3,275 feet to a point 17.51 feet south of the true line.

About August 27, 1917, the defendants purchased from the then owner the south half of the claim by that description. Four or five years thereafter the defendants became dissatisfied with the situation whereby the plaintiff Cooley was occupying and cultivating the north half of the claim together with the strip, whereupon Cooley and his son, Reginald C. Cooley, to the latter of whom the father had conveyed an undivided interest in the land, commenced this suit to quiet title to the three tracts.

Thus called upon to declare their interests in the three parcels, the defendants averred in substance that they were the owners in fee simple of the south half of the claim. They disclaimed all interest in the triangle, lying as it does, north of the true line, and hence being in the geographical north half of the claim. They maintained that the plaintiffs should be estopped from claiming anything south of the true line, for that, on the insistence of the defendants, the plaintiffs agreed in November, 1921, to have the center line dividing the claim established, agreeing to pay one half the expense thereof, in pursuance of which the county surveyor did establish the line so that geographically it divided the claim into two equal parts, north and south halves, which survey showed the strip and half-moon to be on the south side of the true line. Plaintiffs disputed this by the reply, which in turn sets up an estoppel against the defendants to claim title to the strip, for that their predecessors in title agreed with the plaintiff N. W. Cooley the then owner of the north half of the claim, that the division line should be the south boundary of the strip and the center line of the Long Tom River to the east side of the claim, and that the plaintiffs ever since then, for 15 or 16 years had occupied up

to the conventional line thus agreed upon, claiming
title to the land of which it was the south boundary.

From a decree dismissing the suit the plaintiffs ap-
pealed. A word-for-word recital of the testimony
would occupy too much space and would not add any-
thing to the value of the reports for future cases.
We can only give our conclusions as to the weight of
the testimony.

At the outset, owing to the disclaimer of the de-
fendants of any title or interest in the triangle, that
tract will be laid out of consideration, and the plain-
tiffs will be decreed to be the owners thereof in fee
simple, and entitled to possession thereof.

By a deed dated March 31, 1896, N. W. Cooley
acquired title in fee simple to the north half of the
Wilson Donation Claim and by that description.
About that time the south half by that description was
owned by one Ramo, under a deed conveying that
tract to him. In the absence of surveys, the division
line being at that time uncertain, Cooley and Ramo
had a survey made being the south line of the strip.
Beginning on the west boundary of the claim they
went along the south boundary line of the strip to
the river. For want of time the surveyor stopped
at that point and informed them that from thence
east, the river would serve as the boundary line.
They thereupon built a fence on the south line of the
strip being the line thus surveyed, and agreed that
that should be the boundary line between their sev-
eral premises, so far as it extends, and for the re-
mainder of the way across the claim to the east, the
river should serve as the boundary line.

The testimony confirms almost without any ques-
tion whatever, that pursuant to the agreement be-
tween Ramo and Cooley, a fence was constructed
from the west boundary of the claim along the South

boundary of the strip to the Long Tom River, and that Cooley continuously from that time forward occupied and cultivated as his own, all of the strip up to the fence on the south boundary line thereof. As to the part of which the river was to form the south boundary, there is a dearth of testimony indicating that any marked change took place in the actual possession of the half-moon. It is true that the plaintiff's son, the father having died, says that the Cooleys occupied that tract, but nothing is said of anything done there prior to the advent of the defendants to indicate such an occupancy. Whatever the rights of the plaintiffs were, they were fixed and established prior to the acquisition of the title to the south half by the defendants. That cannot be affected by what occurred subsequently except by conveyance or by a prescriptive title based upon a successive ten years adverse possession. The latter cannot be considered because the defendants have not attempted to occupy or control anything north of the fence. Moreover, they were there only four or five years before the commencement of the suit, not long enough to establish title by prescription.

1. It is competent for adjoining owners to agree that the boundary line, although not the true line, shall be as agreed upon as separating the two tracts, but in order to effect the actual title without written conveyance, the agreement must be followed up by the exercise of acts of ownership up to the line agreed upon on each side continued for ten years. This must be true to avoid an infringement upon the law requiring a conveyance to be in writing under seal and acknowledged by the grantor. The title inuring from the agreement plus the occupancy up to the line on both sides is title by prescription independent of the statute of frauds. The principle affecting title

by adverse possession based upon an agreed or con-
ventional line is discussed in *Caufield* v. *Clark,* 17 Or.
474 (21 Pac. 443, 11 Am. St. Rep. 845); *Ramsey* v.
*Ogden,* 23 Or. 347 (31 Pac. 778); *Gist* v. *Doke,* 42 Or.
225 (70 Pac. 704); *Thiessen* v. *Worthington,* 41 Or.
145 (68 Pac. 424); *Gardner* v. *Wright,* 49 Or. 609 (91
Pac. 286); *Moore* v. *Fowler,* 58 Or. 292 (114 Pac.
472); *Dunnigan* v. *Wood,* 58 Or. 119 (112 Pac. 531);
*Parker* v. *Wolf,* 69 Or. 446 (138 Pac. 463); *Sommer*
v. *Compton,* 52 Or. 173 (96 Pac. 124, 96 Pac. 1065);
*Cooper* v. *Blair,* 50 Or. 394 (92 Pac. 1074); *Kreuger*
v. *Brooks,* 94 Or. 119 (184 Pac. 285); *Manning* v.
*Gregoire,* 97 Or. 394 (191 Pac. 657, 192 Pac. 406);
*Hurlbut* v. *Chrisman,* 100 Or. 188 (197 Pac. 261).

The testimony is clear as to the establishment of
the line upon which the fence was erected from the
west boundary of the claim to the river. To this is
added convincing testimony that the Cooleys occu-
pied and cultivated the land up to that fence, the
same being the south boundary of the strip. While
the testimony is clear, in fact undisputed, that the
agreement between Ramo and Cooley was that from
the end of the fence where the division line struck
the river, the stream from there on to the east boun-
dary of the claim should be the division line, yet as
stated, there is not sufficient testimony to show that
any change in occupancy was made as to that part
of the land abutting upon the river, in other words,
the half-moon.

2. Already it has been shown that the parties had
a right to establish the line by specifying it in any
way to which they might agree, but that to this must
be added the adverse possession and the acts of own-
ership indicating that the right was observed in prac-
tice for at least ten years. It was competent for the
parties to carry out the agreement and perform the

same part of the way across the claim, leaving the remainder of the division line to be established by a legal survey.

In *Golterman* v. *Schiermeier,* 125 Mo. 291 (28 S. W. 616), the situation was practically identical with the present case. Having agreed upon a certain line north of the geographical or true division line, the parties proceeded to perform the agreement by erecting a fence along part of the conventional line, commonly known as the Krekel line. The syllabus affecting this situation reads thus:

"For 30 years plaintiff made no claim to land south of a certain line, during which time defendant, the adjoining landowner, claimed up to such line, as plaintiff knew. A fence had been built along only a part of the line, and the uninclosed land consisted of timber land. The only evidence of specific acts of ownership of the latter land by defendant was the cutting of firewood therefrom 20 years before suit, and the cutting of hickory wood for sale 16 years before. Held, defendant did not obtain title to the uninclosed land by adverse possession."

The same doctrine is announced in *Allen* v. *Mansfield,* 108 Mo. 343 (18 S. W. 901). In short, so far as the parties have performed the agreement on the conventional line, although not the geographically correct line, by laying it out, plus adverse occupancy up to that line for ten years, the stipulation as thus partially accomplished must stand, but in that portion where the line, although established has not been confirmed by the necessary adverse occupancy, the agreement must fail.

As to the estoppel pleaded by the defendants in their answer they say "that prior to the commencement of this suit and prior to the filing of the plaintiff's complaint herein, defendants were desirous of having the boundary line between the north half of

said Donation Land Claim and the south half of said Donation Land Claim surveyed and established,'' continuing with the allegations that the survey was made, that the plaintiff participated therein, never appealed therefrom and that in consequence the boundary line between the north half and the south half of the Donation Land Claim was established, being what we have for convenience called the ''true line.''

Manifestly from a consideration of the pleadings, all that was attempted by the survey was to establish the geographical line between the north half of the claim and the south half thereof. It could not and did not disturb the title by prescription by which the plaintiffs held the ownership of the strip. Neither did it cause the defendants to change their position as to the ownership of any of the land.

3. The title to the strip does not depend upon the deed under which the plaintiffs hold the north half of the claim. It is based solely upon the agreement between the plaintiffs and the predecessors in title of the defendants, whereby the conventional line, the south boundary of the strip, was established as the division line between their holdings, followed by continual occupancy up to that line, evidenced as it was, not only by the first survey, but also by the erection and maintenance of a fence on that line. It is not essentially necessary that a fence should be erected. The construction of a fence indeed is a species of evidence commonly present in such cases, but neither its presence nor its absence is conclusive. Anything which could convey to an observer a knowledge of the fact that the title is claimed and the ground occupied by one asserting ownership of it is sufficient. A distinction is drawn reasonably between one who holds title adversely without the consent of the other party and the different case where the occupancy is by the

consent of that other party. *Clark* v. *Gilbert*, 39 Conn. 94, was a case where a man made a parol gift to his niece of a tract of land, of which she took immediate possession and occupied for fifteen years. Concerning this situation the court said:

"Much has been said about an open, notorious possession, but such expressions are not applicable to a case like this. Possession taken under a parol gift is adverse in the donee against the donor, and if continued for fifteen years perfects the title of the donee as against the donor. The donor in such cases not only knows that the possession is adverse, but intends it to be, and there is no occasion for any notoriety. Notoriety is only important where the adverse character of the possession is to be brought home to the owner by presumption. Of course where it is shown that he had actual knowledge that the possession was under claim of a title, and therefore adverse, openness and notoriety are unimportant, for no other person has any legal interest in the question, or right to be informed by notoriety or otherwise."

4. The principle is that in the absence of consent to an adverse occupancy, such a possession must be so marked and notorious that the judge of the facts will be authorized to conclude that the true owner had knowledge of the hostile claim. As to length of time, it is said that this hostile occupancy must continue for the statutory period of ten years before it will ripen into a title. It is only a question of proving knowledge of the adverse holding so far as that attribute of the occupancy was concerned. In other words, it takes a less quantity of proof to establish adverse occupancy as to one agreeing to the same than as to one who has no knowledge of its inception or who does not consent thereto.

From a consideration of the testimony, the result is that the boundary line between the plaintiffs and

the defendants must be thus described: Commencing on the west boundary line of the Donation Land Claim of William Wilson Number 51 in township 16 south, range 5 west of Willamette Meridian, 9 inches south of the northwest corner of the south half of said land claim, and thence running south 89 degrees 43 minutes east 400 feet; thence south 89 degrees 41 minutes east 400 feet; thence south 89 degrees 44 minutes east 400 feet; thence south 89 degrees 18 minutes east 400 feet; thence south 89 degrees 31 minutes east 400 feet; thence south 89 degrees 55 minutes east 400 feet; thence south 89 degrees 48 minutes east 400 feet; thence south 89 degrees 57 minutes east 400 feet; thence south 89 degrees 54 minutes east 75 feet; thence north 17.51 feet to an iron pin; thence east 952 feet, more or less to the east boundary line of said Donation Land Claim at the northeast corner of the south half thereof.

The decree will be that the plaintiffs are the owners in fee simple and entitled to possession of the strip, being so much of the land in dispute as lies west of the river and east of the western boundary of the claim. The plaintiffs are also the owners in fee simple and entitled to the immediate possession of the triangle, being that portion of the southeast corner of the north half of the claim which lies north of the true division east of the Long Tom River and west of the eastern boundary thereof, the title to which the defendants disclaim. Defendants will be decreed to be the owners in fee simple and entitled to the possession of the half-moon, being that part of the south half of the Donation Claim lying south of the true line and bounded on the south and east by the bend of the Long Tom River.

The decree will be thus modified and the plaintiffs will recover their costs and disbursements in this court and in the Circuit Court.

MODIFIED.   MODIFIED AS TO COSTS.

McBRIDE, C. J., and RAND and COSHOW, JJ., concur.

---

Injunction granted July 20, motion to dismiss denied with leave to renew December 11, 1923; argued March 4, reversed March 25, rehearing denied September 23, costs taxed October 14, 1924.