Argued September 10; affirmed September 24, 1946

# SATCHELL ET AL. *v.* DUNSMOOR
### (172 P. (2d) 826)

Charles W. Robison, Judge pro tempore.

*H. G. Hoy*, of Portland, (Hoy & Prag, of Portland, on brief) for appellants.

*Frank S. Sever*, of Portland, for respondent.

ROSSMAN, J.

This is an appeal by the plaintiffs, four in number, from a decree of the circuit court which dismissed their complaint and held that "plaintiffs have no right, title or interest or claim to the following described real property, to-wit: N ½ of the SE ¼ of Section 14 * * * and that the boundaries of said described property are as determined in the surveys made by Beasley and Stoehr in 1945."

The purpose of the complaint was to establish a boundary line. Specifically it sought a decree holding

that a line run by one J. D. Meiser, a civil engineer, in 1938, constituted the true line between the southeast quarter and the southwest quarter of Section 14, Township 2 North, of Range 2 West of the Willamette Meridian in Multnomah County. Five items of property are involved in this suit. All are situated in the two quarter sections just mentioned. Two of the five are owned by the defendant. One is forty acres in extent and is situated in the northwest quarter of the southeast quarter of Section 14. The other is less than an acre in extent and its boundary lines are material only upon a claim of estoppel submitted by the plaintiffs, Thomas and Madeline Satchell, who are husband and wife. They own a forty-acre tract directly west of the defendant's forty-acre tract. It is the northeast quarter of the southwest quarter. The west boundary line of the defendant's main tract is, therefore, the east line of the Satchells'. The same line, if extended north and south in harmony with geometric accuracy, would pass through the center of the section and also through the quarter section points on both the north and the south boundary lines of the section. It would separate the section into halves. The northwest corner of the defendant's property and the northeast corner of the Satchells' would be directly at the center point of the line.

South of the defendant's property is a forty-acre tract owned by Mr. and Mrs. Robert H. Kirkwood, who are not parties to the suit although both of them testified. Adjoining the Kirkwoods' property on the west are two twenty-acre pieces, the northerly of which is owned by the plaintiff, Benjamin D. Morlock, and the southerly of which is owned by the plaintiff, E. J. Payne. Thus it is seen that every item of property

involved in this suit abuts upon the line which separates the southwest quarter from the southeast quarter. The properties of the defendant and of the Kirkwoods are immediately east of the line. Those of the Satchells and of Morlock and Payne are directly west of the line. The properties of the Satchells and of the defendant face each other. Those of Morlock and of Payne face that of the Kirkwoods.

The principal issue before the circuit court, and likewise before us, is the location of the line between the property owned by the Satchells and that of the defendant. The deed which conveyed title to the defendant of his aforementioned forty-acre tract described the property thus: "The West one-half (W ½) of North one-half (N ½) of the Southeast quarter (SE ¼) of Section Fourteen (14) in Township Two (2) * * *."

In 1938 the aforementioned J. D. Meiser ran a line between the southeast and the southwest quarter sections. As a witness, he characterized his survey as "an approximate line" and explained that he was hired to do nothing more than run "a compass line". It was agreed, he swore, that he should set no markers or monuments. While proceeding with his work he did not encounter the markers or monuments which had been set in the course of previous surveys, and he did not verify the accuracy of his work by comparing his line with the field notes compiled by other surveyors who had worked in the section. He testified he began his line from "the bearing trees at the quarter corner between Sections 14 and 23." According to the uncontradicted record, an iron pipe marks the quarter corner just mentioned. Meiser could not recall whether or not he found the pipe, but said:

"I know that I did measure the prescribed distances from the bearing trees." Other evidence indicates that he did not find the iron pipe.

The plaintiffs do not urge that Meiser's line was accurate. In fact, their brief, referring to it, says: "It might not be the exact dividing line between said quarter sections." They insist, however, that Meiser's line, through agreement, was accepted as the boundary line between the properties. They argue that the Satchells, the Kirkwoods, the defendant and predecessors in interest of the Paynes and of Morlock agreed to accept Meiser's line as the true boundary between the southwest quarter and the southeast quarter. They do not claim that the purported agreement was reduced to writing.

The defendant, in addition to denominating the line run by Meiser as "a temporary line," denies that the parties agreed to accept it as the boundary line. In March of 1945 P. W. Beasley, the civil engineer who is mentioned in the part of the decree which we quoted, surveyed the line between the southeast quarter and the southwest quarter of Section 14. He was employed for that purpose by the defendant. The latter depends upon Beasley's line and insists that it is the true boundary line between the forty acres which he owns and the tract which the Satchells own. When the plaintiffs pointed out to the trial judge the discrepancies between the Meiser and the Beasley lines, they used a map and the witnesses, in referring to it, constantly employed the terms "here" and "there". We do not know to what places they referred and, hence, the significance of much of their testimony is lost to us. It is clear, however, that Beasley placed the center of the section and the southwest corner of

the defendant's property substantially different from Meiser. Beasley marked his corners and lines with monuments. He verified the accuracy of his work by resort to the markers which were placed by civil engineers who had run the lines in previous years and also by the use of the memoranda which they had filed in the office of the county surveyor. One of the earlier surveys took place in 1894. Its records were still available in 1945. Beasley began his survey at the iron pipe which we have already mentioned and which is located at the south quarter point of the section. He particularly checked the accuracy of his work against the results recorded by a civil engineer by the name of C. L. Marshall, who, in 1917, marked with monuments the center of the section and also the line running from the center to the quarter section point on the south line. In carrying on his work, Beasley used a map prepared by Marshall and found his markers as well as those which were set in the course of earlier surveys. Without a further review of the evidence pertaining to the accuracy of Beasley's work, we state our confidence in it. It will be observed from the part of the decree which we quoted that the circuit court found that Beasley's line represented the true boundary line between the properties which are in dispute.

■ We quote the following from *Thiessen v. Worthington*, 41 Or. 145, 68 P. 424:

"* * * It is familiar law that, while the title to land cannot be transferred by parol, an agreement made by proprietors of adjacent tracts settling a disputed boundary, or one that is uncertain or unascertained, is not within the statute of frauds, and, if followed by corresponding possession, is binding on the parties, not because it passes title, but because it determines the location of the estate

of each, and places beyond future doubt the true line of separation between them: * * * 'This principle proceeds upon the ground,' says Mr. Justice Craig in Cutler v. Callison, 72 Ill. 113, 'not that title can pass by parol agreement, but that the extent of the ownership of the land of each has been agreed upon, settled, and finally determined. The courts always look with favor upon the adjustment of controverted matters of this character by agreement of the parties in interest; and when an agreement to establish a boundary line is fairly and clearly made, and possession of the land held according to the line so agreed upon, no reason is perceived why such agreement should not be conclusive.' When a disputed, uncertain, or unascertained boundary is thus settled by agreement of the parties, and is followed by occupation in accordance therewith, it is not only binding upon the immediate parties to the contract, but on those claiming under them: * * *.''

A later decision by this court to like effect is *Kincaid v. Peterson,* 135 Or. 619, 297 P. 833. See also the annotation in 69 A. L. R. 1430.

■ Since the plaintiffs are claiming property which is not included within their true boundary lines, but which lies within the tract described in the defendant's deed, the plaintiffs can not succeed in this suit unless the parties who owned the properties along the disputed line agreed to accept as true the Meiser line and thereafter occupied the land up to that line. We shall now examine the evidence for the purpose of determining whether or not it sustains the alleged agreement. We shall also determine whether or not the evidence indicates that the parties followed the Meiser survey by occupancy up to his line. It is evident that the boundary between the southeast quarter and

the southwest quarter was unknown to the property owners whom we have mentioned when Meiser performed his work. It was, however, marked upon the ground with stakes and the latter were identified in notes on file in the county surveyor's office.

In 1938 the property of the persons whom we have mentioned and also that of their neighbors was largely wild land, covered with brush. Its value was small. The thoroughfare which was used to reach Portland was Skyline Boulevard. The defendant was uncertain as to where the lines of his property lay and was anxious to know whether any of his tract abutted upon Skyline Boulevard. The plaintiffs likewise did not know where the section corners were located, and the predecessor of one of them suspected that his house stood in part upon his neighbor's land. In 1938 a brush fire swept through the omnipresent brush and after it had died out it was possible to sight along the surface. The defendant then suggested to his neighbors that a surveyor be employed to run off some of the corners. At that time one C. H. Hopkins owned the tract which the plaintiff Morlock, now owns, and an individual by the name of Watkins owned the twenty-acre parcel which the plaintiff, Payne, now possesses.

About that time Meiser was requested to estimate the cost of running off some of the lines, and his answer was that the charge would be $300. When that fact was reported to the interested parties some of them felt that they could not afford to defray their part of the undertaking and thereupon the project was abandoned.

Upon a Sunday in July of 1938 the defendant brought Meiser to the neighborhood and introduced him to the Satchells, to Mr. Hopkins and to Mrs. Kirk-

wood. The latter's husband at that time was in a distant part of the state. Upon that day Meiser ran the line upon which the plaintiffs rely. Seemingly some discussions had taken place before he arrived, and it seems that he had expressed a willingness to run a line for $20, provided he was not required to slash brush. The defendant, Hopkins, Satchell and Kirkwood had agreed to contribute $5.00 each to the $20 fee and had also agreed to slash brush.

The defendant, in describing what occurred when Meiser reached the neighborhood, said:

"So then we agreed to have this man run the half a mile as a temporary line between our joint properties. * * * He came out there and Mr. Satchell, Mr. Hopkins and myself met him. Mrs. Kirkwood and her son came, oh, I should say, an hour or an hour and a half after we had started our survey. Mr. Meiser told us at that time again that he could not give us a true line with what he had to go on; that it would only be a temporary line, and that it was liable to vary a considerable distance in either direction, because I think he stated that he ran—oh, it was 21 or 22 degrees east of north, because that I believe is assumed to be a northerly direction in this part of the country. So we slashed ahead for him as we had agreed to do, and he had one chainman working with him. We run that line. When we reached 660 feet, which was Mr. Hopkins' and Mr. Watkins' joint corner, Mr. Meiser told us that that was 660 feet, if we were interested. Well, some of us put down a stake, because Mr. Meiser said he would not put down a stake on the line. Then when we reached 1320 feet, to my recollection he told us that was 1320 feet, and we set another stake. Then when we ran half a mile we set another stake, and that was the end of the temporary line that he was running through there. And then we went back, I believe, and we all con-

gregated down near the 1320 stake—and that would be halfway on that half mile—and we paid Mr. Meiser. And as some of the neighbors have said, we were all glad that this line had been run, because we had some idea of where to put fences, some idea of where our property lay.

"Q. What was your purpose in putting down stakes?

"A. Well, Mr. Hopkins was affected by the 1320 feet; that is, he had that piece of property in there, and he had his house built. It was a matter of controversy as to where he had his house built, so he asked Mr. Meiser to switch his instrument around and give him some idea what east and west would be there, to see about where his house was sitting. Well, it so happened that it cut through one corner of Mr. Hopkins' house. Well, Mr. Hopkins didn't feel very good about that, and Mr. Meiser told him that the survey was indefinite; that he should not worry about it, or words to that effect. I can't recall the exact words. And to my knowledge, that was why the stake was set.

"Q. Was there any agreement between you and the plaintiffs in this case, or any of them, that a line as surveyed by Mr. Meiser should become the boundary between your properties?

"A. No, there wasn't, nor I wouldn't make such an agreement, because Mr. Meiser had definitely told me twice that he could not establish a legal line through there and it wouldn't hold in court. That is my understanding of it."

Two of the markers which the neighbors set were iron pipes. One was placed at the northerly end of the line and the other at the 1320-foot point. Robert Kirkwood, as a witness for the plaintiff, said: "We had a bunch of wood pegs." He said that they set one whenever they came upon a spot which they wished to

mark. It is clear that Meiser set no markers. He swore that he set "only the necessary hubs for transit set-ups." According to Hopkins, Meiser said "he wouldn't drive no stakes because we were not going clear through with it. * * * he wouldn't drive no stakes because he had his license involved and he didn't want to forfeit that."

Mrs. Satchell, referring to the defendant, testified:

"He came back and said he went to see the surveyor and he would run a line between the four forties and establish a corner for twenty dollars if we would slash through. We agreed on that. * * * Then about eight o'clock or nine the surveyor and Dunsmoor came out, and they started up at the corner and the surveyor said, 'I want you people to understand this might not be right on the line; you are not getting the whole section surveyed, but it would not be off five or ten feet either way.' We said we didn't care about five or ten feet; we would be satisfied. And we all agreed on that line."

Mrs. Kirkwood testified:

"I was visiting at my son's house at the time, and Mr. Dunsmoor came up, and I think the surveyor was with him that Sunday morning—I am pretty sure he was—he came up and asked if we wanted to enter into the survey and it wouldn't cost very much now because they had got a man—had a man for twenty dollars, I believe it was, for the four. They would all go together and it wouldn't cost so much for each one. Well, we drove up in our car, my son and I, and they said they would have to have someone slash brush. I couldn't do it, so I had my son slash my brush and do my part for me."

Upon cross-examination, Mrs. Kirkwood testified that most of those who were interested in the survey had assembled before she joined them and that she did

not know what was said at the outset. We quote again from her testimony:

"When Mr. Dunsmoor came up to our place he said they wanted to run a line—to establish a line between the four forties—yes, there is four forties.

"Q. Did he say that was to be the permanent boundary line of the properties?

"A. I naturally supposed it would be.

"Q. Not what you naturally supposed, but what did he say?

"A. Well, I don't remember just the exact words. He brought a surveyor out.

"Q. Was there anything said when you arrived at the place as to what that surveyor was going to do, what was the purpose of his survey, what kind of survey he was to make?

"A. No, I didn't hear him say what kind of a survey he made. He was a surveyor.

"Q. Did you hear him say anything to the effect that it was not and would not be an accurate survey?

"A. If he had I wouldn't have paid him."

Hopkins testified that when he acquiesced in Meiser's employment he did so, not only on his own behalf, but also upon the express authority of Watkins who then owned the twenty acres immediately to the south which is now owned by the plaintiff, Payne. The latter did not testify. Hopkins swore:

"Well, the way I understood it, it was just some place to put up fences so that we could keep our stock in and not get over—my house was pretty close to the line, and I was worried about it at that time.

"Q. And was there anything said about that line that he was to run being the boundary between your properties?

"A. Not that I recall of any agreement of that kind.

"Q. Was there anything of that kind said at any time?

"A. Not that I remember.

"Q. What was your understanding of the purpose of that line?

"A. Well, so that we could have somewhere near knowing what to do there; not just fencing. I was trying to build a house. I was wanting to know just somewhere where my property lay so that I would know where to clear.

* * * * *

"Q. Did you have any understanding that this was to be the permanent boundary between your property and your neighbors' or between the other neighbors' and yours?

"A. No, sir.

"The Court: Was this for the purpose that four people who had land adjoining wanted to have some common understanding, some common knowledge, as to where some line was that you would not encroach on each other's land, you would not build on each other's land, or you would not clear each other's land?

"A. Well, the way it was, so we wouldn't build on each other's land. And they mentioned that the fences could be always moved if it was necessary. A fence when it stays over so many years at a time would have rotted out anyhow.

"The Court: In other words, it was the understanding that this was a tentative situation and was not anything permanent?

"A. No.

"The Court: And if later on a survey was made you could go back or forth, but it kept you from building your houses on other people's property and encroaching one upon the other?

"A. Yes."

From Meiser's testimony, we quote:

"I say approximate. I told him anything I would do would not be legal, because I would not for the amount offered follow the prescribed method of subdivision.

"Q. What arrangement was finally made between you?

"A. Well, I was to go out and run a line starting at the quarter corner between 14 and 23, and just run a compass line approximately a half mile north.

\* \* \* \* \*

"Q. What was any conversation that you heard between Mr. Dunsmoor and these neighbors as to the purpose of this survey?

"A. Well, I understood that it was to establish an approximate line so everyone could stay away from it with improvements."

He swore that he heard no discussion wherein the parties agreed to accept his line as the boundary between the properties. We quote again from him:

"A. As I understood it, there was no exact location for the property there, and the property owners wanted to be sure they stayed away from the disputed area or the possible area of dispute. In other words, in clearing or building or anything else they would stay far enough away from the approximate line so as not to cause any difficulties."

Mrs. Dunsmoor testified that after it developed that the cost of surveying the entire section was excessive:

"We went back and made a special trip during the week and contacted the Hopkins and the Satchells and told them what the surveyor had said, and they said, 'Well, even if it couldn't be a true line'—because they financially couldn't; all of us felt that we couldn't pay for this whole section— 'why, we would run a temporary line that we would

know approximately where our lines would be,' and that is what we done.''

She then described how Meiser made his survey, adding:

"And we could set a stake if we wished for our own benefit, to know, but he had nothing to do with any stakes whatsoever, and all we was running was the true north and south line, which would vary considerably anyway, because he had nothing to go by.''

■ The above is the substance of the testimony, apart from an item which we shall mention later, which indicates whether the Meiser survey was preceded with an agreement that his line should be accepted as the true north and south boundary line. Although the above evidence proves that the Satchells, the Kirkwoods, Mr. Hopkins and the defendant employed Meiser to survey a line, it affords scant support for the proposition that the parties bound themselves to accept his line as the true one which separated the southwest from the southeast quarter. If the parties intended to agree that the line which Meiser was about to run should be accepted as the true westerly line of the properties of the defendant and of the Kirkwoods, and as the true easterly line of Hopkins and of the Satchells, they entertained different conceptions of the nature of the service which Meiser was about to perform. Mrs. Kirkwood, for instance, thought that he was engaged to run an accurate line, and swore that "I wouldn't have paid him'' had she known otherwise. Mrs. Satchell swore that she was told that Meiser's line might "be off five or ten feet either way,'' but she was prepared to tolerate that much of a deviation. Hopkins understood that Meiser's undertaking called for nothing more than a tentative line. He heard no

discussion concerning an accurate or permanent line. It is clear that Meiser did not believe that his engagement called for accuracy. Although the markers and monuments which were set in previous surveys remained in place, he did not seek them. He employed none of the means commonly used by civil engineers to verify the accuracy of his work. The haphazard manner in which he proceeded, and the fact that he set no stakes, must have been a warning to any of the neighbors who expected to accept his line as a permanent boundary. If anyone present thought that Meiser's work would be controlling upon all, he must have experienced misgivings when it developed that the east and west line which Meiser sighted through as an accommodation to Hopkins placed a part of Hopkins' house upon a neighbor's land. Surely Hopkins could not have been expected to accept the line as correct without having its accuracy verified. Doubts concerning it threw into question the Meiser north and south line. It will be recalled that the defendant, his wife, Hopkins and Meiser refuted the evidence which indicates that before Meiser began his work all agreed to accept his survey as the true line. Without further analysis, we express our belief that the evidence does not prove that the survey was preceded with the alleged agreement.

The plaintiffs, in their efforts to prove that the parties agreed to accept the Meiser line as the boundary between the southeast and the southwest quarter sections, depend much upon what was said shortly after Meiser completed his work and also upon a couple of fences which were built after the survey was completed. The conversation which followed the Meiser survey, and upon which the plaintiffs depend, took place at

the midpoint of the Meiser line. There the parties gathered after Meiser had completed his work and there each contributed his part toward Meiser's charge of twenty dollars. The testimony upon which the plaintiffs particularly rely was given by Mrs. Kirkwood, and follows:

"A. I know I was very much pleased that four neighbors could get together and establish a line and be pleased with it, because we had had trouble once before on a line, and I thought, 'Well, that is wonderful to live in a neighborhood peacefully and not have to dispute a line, have it established, and put up fences.' I am still pleased where it is.

*　　　*　　　*　　　*　　　*

"A. Well, as I remember it, everyone was there: all four owners, Mr. Hopkins, Mr. Dunsmoor, Mr. Satchell and myself, and I know my son was there. We were together.

"Q. Was the surveyor there?

"A. Yes, he was there.

"Q. Now, Mrs. Kirkwood, what, if anything, was said by the others when you made that remark? What did they say?

"A. Well, as I remember it, I asked the different ones if they were satisfied with establishing the line and the corner. Now I can't recall the exact words, but I remember someone said, 'Well, it is Jake by me' and 'It is O. K.' I said I was very much pleased with it. I can't remember just the exact words.

"Q. Did anyone there express any dissatisfaction with it?

"A. Oh, no."

The plaintiffs make much of Mrs. Kirkwood's testimony. They claim that in the informal gathering which she described a meeting of the minds occurred, and that all agreed to accept Meiser's line. Mrs. Kirk-

wood's son Robert, who participated in the survey, swore that he heard his mother make the above-quoted statement, but said, "I don't remember hearing Dunsmoor ever make any remark about it." The plaintiff, Satchell, testified:

> "Mrs. Kirkwood said that was awful nice, that four people could agree on one thing. She said that was rather unusual."

He added that he did not hear the defendant say anything, but that the latter seemed as well pleased as the rest with the "establishment" of a line. Mrs. Satchell testified:

> "So every one of us paid the surveyor there. Mrs. Kirkwood said, 'Isn't it wonderful four owners can agree on a line. It very seldom happens.' She says, 'How about you, Satchell?' He said, 'Yes,' and Dunsmoor said the same thing, and so did Hopkins. We all agreed on that line."

Hopkins, referring to Mrs. Kirkwood's remark, said:

> "The way I understood it was that she was glad to be able to agree on some place to put our fences so we could get the places cleared, so we could run a good line through."

It will be recalled that he termed Meiser's line a tentative one and said that fences could be readily moved. We have already given the defendant's version of the conversation which took place at point 1320; he testified, in part:

> "And as some of the neighbors have said, we were all glad that this line had been run because we had some idea of where our property lay."

Mrs. Dunsmoor testified:

> "But, as I say, as he came up the line and got down to Hopkins', Satchells' and Kirkwoods'

corner, why, most of us women were there. We had been at Mrs. Hopkins' and it wasn't as brushy from the burn, and, of course, we were there. After they had went through to the north corner they all came back, the men, with us down there near that corner.

"Q. What happened there?

"A. Well, I remember myself that he was saying that—we were all more or less jabbering. No one was paying too much attention, but he was trying to bring the point out to everyone, particularly I think to us, to the women, because we were not there when they started, that this was only a temporary line; that it would not hold up in court; that it was not a survey, but it was just a temporary line, because we wanted to fence because the stock was continually coming down there or coming through, so you had to fence in order to have your garden or anything else that you wanted to keep away from the stock."

 In appraising the value of the testimony which indicates that after Meiser had run his line the neighbors agreed to accept it as accurate, it is pertinent to take note of evidence which shows that after the alleged agreement was formed the location of the line remained a matter of discussion and even of dispute. The fact that the neighbors still felt uncertain as to the location of the line refutes the contention that Meiser's survey was accepted as the true line. We shall mention three instances which are at variance with the plaintiffs' contention: (1) After Meiser had completed his work the defendant sought several times to purchase from the Satchells a strip of their land so as to give him better access to Skyline Boulevard. In rejecting his overtures, the Satchells claimed, according to the defendant, that they were uncertain about their lines and that it might develop that their property extended be-

yond the strip he wished. If that testimony is truthful, and we believe that it possesses merit, the Satchells lacked confidence in the Meiser line. Mrs. Satchell, who gave the sole testimony upon this phase of the case for the plaintiffs, did not deny that the offers were made and rejected, but claimed that she and her husband could not sell because (a) a mortgage encumbered their property, and (b) their son owned the property. We observe, however, that the complaint alleges ownership in the Satchells. (2) Some time after the Meiser survey was made Mrs. Satchell and Mrs. Dunsmoor conferred with the county surveyor and were told of a monument which marked one of the section corners. Thereupon a painstaking search was made to find the monument. Mrs. Satchell joined in the search. Both the visit to the county surveyor and the search for the monument are at variance with the contention that Meiser's line had been accepted as the true boundary line. (3) In February, 1945, the Satchells employed an attorney to petition the county surveyor to establish the section corners. The attorney prepared a petition addressed to the county surveyor which requested that official "to re-establish the quarter-section corner between Sections 14 and 23 * * * and the line forming the Eastern boundary of the S. W. ¼ of Section 14, and the Eastern boundary of N. E. ¼ of the N. W. ¼ of Section 23." The petition stated that it was based upon § 87-321, O. C. L. A., and prayed the official to comply with § 87-318. It suggested that testimony be taken, and mentioned some contemplated witnesses. According to the petition, the purpose of the contemplated proceeding was "the correct establishment of the said quarter-quarter corner and the lines emanating therefrom." Upon the trial it was

conceded that both of the Satchells signed the petition. The plaintiffs, Payne and Morlock, also signed it. The fact that Mr. Satchell at first denied that he signed the paper discredits his other testimony and adds significance to the petition. When the latter was produced, the plaintiffs' counsel declared:

"I never learned of this alleged agreement—I will call it an alleged agreement, not because I don't have the utmost faith in it, but only out of courtesy to the parties in litigation here—this alleged agreement was never mentioned to me at that time, * * *. And I then took it up with the county surveyor's office and I filed this petition to have the line run, not knowing at that time that there had been, as we now contend, and as my people now contend, as they afterwards told me, this other survey and an agreement at that time that established the line."

According to Mrs. Satchell, she called upon the county surveyor several times before the petition was prepared and inquired of him about the surveys that had been made earlier in Section 14. She told the county surveyor in the course of these visits about Meiser's line. Therefore, Meiser's survey was in her mind when she gave her attorney the data he needed for the preparation of the petition. Her failure to tell her attorney about the purported agreement is a clear indication that she reposed no faith in it. Neither she nor her husband explained why they sought a survey by the county official if they believed that the neighbors had agreed to abide by Meiser's line. Payne and Morlock did not explain their signatures to the petition.

Without further analysis, we express our belief that the parties did not follow the Meiser survey with an agreement to accept it as the true boundary between the southeast and the southwest quarters.

■ There remain for mention the facts that (1) the defendant and the Kirkwoods, in building fences, followed the Meiser line, and (2) when the defendant purchased from the Satchells the small parcel of land (about 150 by 192 feet) which we have already mentioned, the parties measured out the parcel by starting at a point on the Meiser line. The purpose of the purchase was to afford the defendant access to Skyline Boulevard. The conveyance was made in February, 1945.

In 1940 the defendant built a wire fence between his and the Satchells' property which followed the Meiser line. In the performance of the work he was helped by Mr. Satchell and the latter's son. As a witness, the defendant said:

"I cleared some property there and planted some spuds, and the neighbors' stock was running wild in that country at that time, and I had to have something around there or else lose my spuds, so I built a fence up on both sides of that and along that temporary line that was run through there."

He explained that he requested Mr. Satchell to help him in the construction of the fence because "I figured that that fence would help them indirectly." The Kirkwoods also built a fence which followed the course of the Meiser line. Their reasons for building it are not mentioned in the record. Alongside the Kirkwood fence a concern entitled Skyline Land Company built a road. Its president, Mr. G. H. Rheam, swore that he had not heard of the Meiser survey until "just the other day," and that he never sold any property or took any other action in reliance upon it.

When the defendant and the Kirkwoods built their fences there were no surveys, lines or markers of which

they were aware except the Meiser line. Hence, it was natural for them to follow that line. Especially so since, as Hopkins said, a wire fence can be readily moved to the true line whenever it becomes known.

Unchallenged testimony indicates that the defendant cleared away no brush within seventy-five feet of his fence, and that the Satchells cleared not even a foot of land on their side. Likewise, the Satchells made no improvements in the vicinity of the fence. In fact, after the brush fire, nature reclaimed to herself the area on the Satchell side of the fence, and the growth of brush there is even more dense today than when the fence was built. Hence, the couple of strands of wire and the occasional post which constitute the defendant's fence are in an area which is in the actual possession of no one. The evidence does not indicate whether or not the Kirkwoods have cleared their land up to the fence. It likewise does not disclose whether any improvements have been made on the part of their property in the vicinity of the fence.

The foregoing are the facts about the fences. We find nothing in them indicating that the defendant and the Kirkwoods in building their fences adopted the Meiser line as the established boundary. Since they knew of no other survey, it would have been novel had they built their fences in other places. The fact that neither the defendant nor the Satchells slashed any brush in the vicinity of the Meiser line indicates that they were uncertain as to the location of their boundaries. Slashing brush is toilsome work. One of the neighbors whose property borders on the disputed line swore that he purposely refrained from the backbreaking labor of slashing brush near the line because he did not want to clear land which he possibly did not

own. We repeat, the building of the two fences fails to prove that the defendant and the Kirkwoods adopted the line as the true boundary. Further, the evidence shows that no one occupied any of the land which is now in dispute. As we have seen, occupancy is indispensable to the principal of law which the plaintiffs seek to invoke. It may be that under different circumstances building a fence might be tantamount to the exercise of possession over everything within the enclosure, but since the evidence before us shows that the construction of the defendant's fence was accompanied with uncertainty as to the line, and with no assertion of ownership up to the fence, we do not believe that the maintenance of the fence was the equivalent of possession.

We come now to the small parcel aforementioned which the defendant bought from the Satchells. While the negotiations concerning it were under way the defendant and Mrs. Satchell went to the area and measured it off. They commenced at a point on the Meiser line. It must be recalled that at that time the Beasley survey had not been made, and that none of the neighbors knew of the stakes which were set by Marshall and which still remained in place.

The defendant testified:

"I measured that out from that line for the reason that I had to get through in that particular spot. There has always been a controversy about that line, and I wanted to be certain that I came to that line and farther. And I explained it to Mrs. Satchell—"

He next explained what happened when the deed was under preparation:

"I believe that my counsel has the record of the description that I wanted made in the deed. How-

ever, you folks changed that to suit yourself, and being that you mentioned in there 192 feet and 142 feet, more or less, why, I questioned you up in your office when you gave me that deed, and I said, 'Well, Mr. Hoy,' I says, 'I want to be sure I am getting out of this property.' And you says, 'The deed takes care of that.' The only thing is, you said that if the line changes one way or the other I would be buying land that I already owned, or the Satchells would be losing land. Now that is the words that you said to me.''

That evidence is unchallenged. The transaction was completed before the Beasley survey was made. The deed from the Satchells to the defendant does not mention the Meiser line or survey. It reads:

"Beginning at a point on the south line of the NE ¼ of the SW ¼ of Section 14 * * * where the same intersects the center line of what is known as Skyline Boulevard * * *.''

■ The plaintiffs argue that since the defendant and Mrs. Satchell commenced at a point on the Meiser line when they measured on the ground the parcel of 150 by 192 feet, the defendant thereby estopped himself from questioning the accuracy of the Meiser line. As developed by the subsequent Beasley survey, the Satchell deed described a parcel of land which was already owned in large part by the defendant. Thus the latter paid the Satchells for a tract, a part of which was his already. The purpose of the defendant and Mrs. Satchell in marking on the ground the outlines of this parcel was to assure themselves of the exact piece which the defendant wanted. He desired access to the highway. He wanted to avoid a ravine nearby and to secure the little area which he feared he did not own and which would bring him up to the highway.

The Meiser line, identified as it was by the defendant's fence, was a convenient starting point. Just beyond the fence was the highway. Between the two was the strip which the defendant wanted. By measuring from the fence the defendant made no representation that it was correctly placed. He merely made known his wish to acquire a given number of feet measured from the fence. As is clear from the evidence which we have already reviewed, no one was certain at that time whether the fence stood on the true line; in fact, in the very month when the Satchells signed the deed they also signed the aforementioned petition addressed to the county surveyor which requested that official to dispel uncertainties by resurveying the lines. Thus, even if it could be inferred from the defendant's action that he represented that the fence stood on an agreed boundary line, Mrs. Satchell did not rely upon the purported representation. We fail to find in this evidence the elements of estoppel. There was neither a representation that the Meiser line was an agreed boundary nor a reliance upon the alleged representation.

The above completes our analysis of the evidence. We have analyzed the latter, item by item. Each item fails the plaintiffs. When all items are thrown together they do not, in our opinion, possess that cogency which is required to show that the parties agreed to accept the Meiser line as the true boundary. We think that Mrs. Dunsmoor spoke the truth when she testified: "We had run this temporary line, all in good faith, figuring we would accept it until the section could be surveyed and definitely marked." We believe that such was the situation. Unfortunately, the twenty dollars which was paid to Meiser was ill-spent. An inexpensive piece of work was wanted; in fact, it was

all that could be afforded at that time. For the small fee that was available, the surveyor could not afford to employ the methods required to assure accuracy. Just before Meiser was hired to do the twenty-dollar job he had quoted the sum of three hundred dollars as his charge for accurate work. We are certain that none of the parties to this dispute accepted the Meiser survey as the true boundary line. They deemed it tentative or temporary, but not permanent. We do not believe that the agreement averred in the complaint has been established. In our opinion, the Beasley survey was correct, and the defendant is entitled to claim ownership up to that line.

The decree of the circuit court is affirmed.