Argued January 16, affirmed February 11, 1958

HARRIS ᴇᴛ ᴜx *v.* BACKUS ᴇᴛ ᴀʟ

321 P. 2d 315

*Richard L. Thwing,* Cottage Grove, argued the cause and filed a brief for appellants.

*Herbert W. Lombard,* Cottage Grove, argued the cause for respondents. With him on the brief was William D. Miller, Salem.

Before Pᴇʀʀʏ, Chief Justice, and Rᴏssᴍᴀɴ, Bʀᴀɴᴅ and McAʟʟɪsᴛᴇʀ, Justices.

ROSSMAN, J.

This appeal challenges a decree which the circuit court entered in favor of the plaintiffs in a suit instituted by them to quiet title to property in Douglas county, which the complaint describes by metes and bounds. The plaintiffs, Ben and Alice Harris, are husband and wife. The defendants, Clarence C. and Nellie Backus, are, likewise, husband and wife. There are two other defendants, Walter T. Backus and Reuben H. Mast. The former is the son of the other two Backuses and received his interest in the property from them. We need not at this point mention the nature of the interest in the property held by Mast. The plaintiffs and the defendants are owners of adjoining tracts of land; that owned by the defendants is immediately south of that owned by the plaintiffs. Both tracts are devoted largely to forestry purposes, although the plaintiff, Ben Harris, operates a sawmill upon a part of his land, and the defendants raise cattle and produce some hay upon theirs. Hereafter, when we employ the word defendants we will mean Mr. and Mrs. Clarence C. Backus.

The controlling issue in the suit is the location of the line which separates the two properties. Both are in Section 34, Township 20 South, Range 6 West, Willamette Meridian. The defendants' is in the southwest quarter of that section, and, if their contentions are sustained, they own the entire quarter section, subject to the interest of the other two defendants, which is of no consequence to the issues before us. The plaintiffs' tract is, as we have said, north of the defendants' and, if their contentions are confirmed, it includes a segment of the southwest quarter. The segment which they claim has, roughly speaking, the form of a triangle. The base of the latter is the quarter

section line. The west side of the triangular parcel is the part of the west boundary line of the section which begins at the quarter section corner and extends 94½ feet south. The third boundary line of the disputed triangular tract is the hypotenuse of the triangle; it begins at the south end of the west line of the triangle and, running easterly, extends to the center point of the section. The line which we just described [hypotenuse] is well marked on the ground. The plaintiffs argue that it constitutes the boundary line between their tract and the defendants'. The defendants, upon the other hand, insist that the line which we deemed the base of the triangle, and which extends from the quarter section point to the center of the section, is the true boundary line. We said that the west side of the triangular tract is 94½ feet long. At the southern extremity of that line, that is, 94½ feet south of the quarter section point, a large stake was driven into the ground in the year 1911 or prior thereto and has remained there ever since. Nobody disputes its existence and all seem to infer that the purpose of placing it there was to mark a point and possibly the beginning of a line. One witness, who has lived in the area for more than forty years, testified that he had long been familiar with the stake. He and others indicated that the ground in the immediate vicinity of the stake was cleared of trees, with the result that importance was lent to the stake and it became more noticeable. The witness just mentioned, in speaking of the stake, testified: "If you ever saw it once, you would never forget it." For the sake of complete accuracy, we add that the stake stands a few feet west of the west line. As we said, the stake stands 94½ feet south of the quarter section corner. Beginning at that point a blazed line runs to another stake which marks the approximate

center of the section. The existence of the center stake is unquestioned. The county surveyor, at the request of the defendants, ran some lines and found that the center stake was within four tenths of a foot of the true center.

The southwest corner of the section is marked by an iron pipe which has on its top a brass cap. That fact is undisputed, and all appear to concede that the marker is correctly placed. A witness tree stands at or near the quarter section corner on the west line of the section. Referring to it, the county surveyor, whose services were engaged by the defendants, testified:

"* *. * a tree had been chopped into; and we measured the distance on to the point where there was a stake set in the ground and this stake, I believe from initials and tags on the tree, was set there by Wilbur Haines, who is a registered surveyor from Drain."

That tree is 94½ feet north of the stake which we previously described and, as we have said, it [the tree] marks the quarter section corner. The blazing upon it took place at a time unknown to any person who testified, but, since the tree's growth had partially obliterated the blazing, it is clear that it occurred many years ago. The county surveyor, in rendering his services, gave attention to the tree and, in testifying, mentioned many of the facts of which we have just taken notice. Although the two stakes which we have described and the blazed line which runs between them played a part in determining boundary lines as the predecessors in title of the plaintiffs and the defendants dealt with the properties, the blazed tree remained unnoticed until shortly before this suit was filed.

From the facts that (1) the southwest corner of the section is well designated, (2) a tree which stands

in the quarter section corner was blazed years ago, and (3) the center of the section was denoted by a stake, it is apparent that a competent surveyor who wished to locate the true line between the southwest and northwest quarters could have done so accurately. However, we surmise that the extensive underbrush would render the work costly.

A circumstance which lends significance to the two stakes and the blazed line which lies between them is the fact that the larger timber has been cut from the defendants' land but not from the plaintiffs'. In felling the trees, the blazed line was respected and, accordingly, a noticeable change in the standing timber takes place at the blazed line. A surveyor, who took careful note of the facts, testified: "There hadn't been any trees cut north of the blazed line." Thus, the change in the timber that occurs at that line accents the latter. It indicates that heed had been given to the line for an important purpose.

As we have said, the plaintiffs claim that the blazed line which we just described is the border between their property and that of the defendants. If that is true, they own the tract we have described as, roughly, triangular in shape and which constitutes the most northerly part of the southwest quarter. The defendants, upon the other hand, contend that the line which separates the southwest quarter from the northwest quarter is the border line between their property and the plaintiffs'. If their contention is correct, they own the entire southwest quarter. In that event, the blazed line, although its existence is conceded by all, is not a boundary marker. Thus, this triangular-shaped tract is the only piece of property in dispute in this suit.

The record does not reveal the identity of the individual who put in place the stake which stands in the

west line of Section 34 at a point 94½ feet south of the quarter section point. The stake is four inches in diameter and was squared at the top. The wood out of which it was shaped was well selected, for it contains such a quantity of pitch that it has been able to withstand the vicissitudes of forty years and yet remain well preserved. A witness tree stands near it, and received comment from the witnesses as they described the surroundings. At about the same time that the stake was placed, someone blazed the line which begins there and runs to the center of the section. A surveyor who was familiar with the blazed line testified: "It had an indication of being old when I first looked at it." No one questions the blazes upon the trees nor the fact that they can be traced without difficulty to the stake which stands in the center of the section.

According to the plaintiffs, the parties and their predecessors in title have treated the blazed line ever since 1911 as the boundary that separates the two properties. We shall not review the testimony given by all the witnesses, but for the purpose of illustrating its nature, we will take note of facts to which three or four of them gave expression.

Arthur Woolley, in 1911, filed a homestead entry upon the property which the plaintiffs now claim as theirs and remained upon it for a year. He testified that while living there he observed the two stakes which we have mentioned and the blazed line which runs between them. "I accepted that line," so he stated, "as the southern boundary." He added that he claimed all the land up to "the blazed line from this stake to the other stake." He had recently been upon the property and had found that the stake which he noticed in 1911 was still standing. He swore that it denoted

the northwest corner of the defendants' property and the southwest corner of the plaintiffs'.

Henry Fred Prelle, 80 years of age, who resides in Section 33, immediately east of the section which contains the tracts in dispute, detailed the manner in which, while hunting, he encountered the stake which stands in the west line of Section 34 where the blazed line begins. According to him, an individual by the name of Earl Harris, who lived on the defendants' tract twenty years ago, "respected" the blazed line and did not go over it. The witness testified that he had charge of the property now owned by the plaintiffs and that, at a time preceding that in which the defendants acquired their property, some logging was done on that tract, and that he was then assured by the logger in charge of operations that the blazed line would be respected as the boundary line. He swore that the logger did not cross the line. Nine or ten years before testifying, Prelle, so he swore, sold to the plaintiffs the tract they now own. According to him, the blazed line has been respected throughout as the boundary line between the two tracts.

William Wooley, 37 years of age, testified that a year ago the defendant, Clarence Backus, induced him to examine the timber upon his property with a view of relogging it. He explained:

> "Mr. Backus took us to the back line that joins Mr. Harris and where the timber had been cut to and told us that that was the line and we would find the corner on a hill a little ways from there."

[That stake is the one which stands at the westerly end of the blazed line.] Wooley swore that no timber had been cut over the blazed line and that Clarence Backus told him that the plaintiffs owned the land north of the blazed line.

John Perini, who had been engaged in logging for thirty years, swore that in 1914 a family by the name of Clevenger lived upon the Backus property. He testified that he and Clevenger worked together in grading a nearby road and that while so doing he noticed the stake that marks the western extremity of the blazed line. According to him, Clevenger said that the stake marked the corner between the two tracts. Defendant Clarence Backus, in 1952, sought to interest him, so Perini swore, in relogging the Backus property and in so doing showed him the aforementioned stake and blazed line. At that time Backus told Perini, so the latter testified, that the blazed line separated the two properties and that all north of the line belonged to the plaintiffs. Upon cross-examination, the following occurred:

"Q Do you want this Court to understand that Mr. Backus told you that that blazed line was his true north line?

"A He certainly did.

"Q Do you want the Court to understand that he also told you that the stake was the northwest corner of his property? Is that correct?

"A It was the northwest—yes. It would be the northwest of his property."

Plaintiff Ben Harris testified that he purchased his property in July, 1945, and added:

"I was showed the lines through there three years before I bought the place."

He continued:

"but before I logged off any from my property, Mr. Backus logged next to his property and we agreed to use the line that was there between the two pieces of property."

He was then asked to trace the line to which he had referred and, in answering, described the two stakes which we have mentioned, after which he said:

"then there was a blazed line westerly through to the southwest corner of my place and the northwest corner of Mr. Backus' land and well blazed between them."

Harris testified that in January, 1947, "when Mr. Barney and Mr. Asker logged into my mill", the defendant Backus

"wanted to make sure that I understood where the blazed line was and that he didn't get across it and he wanted Mr. Asker to understand where the blazed line was too."

The conversation, according to Harris, occurred at his mill and all those whom we have just mentioned were present. When Harris was asked to repeat what Backus then said, he replied as follows:

"A Boy, now, them little words exactly right is awfully hard to tell. The understanding was that Backus wanted, when he came in there, was to know that I was satisfied with the line between our places and to show the line to Mr. Asker through there so that they wouldn't cut across into my timber.

"Q What did you and he agree on?
"A We agreed to use the line. I asked Mr. Backus if he wanted to get a surveyor and mark up the line better or resurvey it and he said no, that line was all right with him and I said that it was all right with me. We peaceably agreed to use that line like good neighbors.

"Q Have you always recognized that line as your south line?
"A Yes, sir."

Sometime later the defendants entered into an agreement of undisclosed terms whereby they sold their timber to the defendant, Reuben H. Mast. Shortly

after that agreement was formed, Mr. Backus, so the plaintiff Ben Harris swore, called at the plaintiffs' home and then the following occurred:

"Well, Mr. Backus told me that he wouldn't have sold the timber to Mast if he knew Mast was going to come over and try to go across the line and take the other. Mr. Backus said he showed Mast the blazed line and showed him the corner stake and said, 'I told him this timber laying south of the line here is mine; that is what I am selling you. And what lays north of the line here belongs to Ben Harris.' Mr. Backus told me that and also Mr. Mast told me the same thing."

Although it was Mast, and not the defendants Backus, who signed the answer, he did not attend the trial and, accordingly, the testimony just quoted remains unchallenged by him. It is clear that he was familiar with the stake which marks the west end of the blazed line, for he shaved a part of it with his axe and then wrote upon the smoothed area his name and the date "1/10/54." When the defendant, Clarence Backus, was under cross-examination and it had developed that he had never seen the answer, the following occurred:

"Q Whose case is this—Mast's case or yours?
"A Well, that is something I don't know either."

Defendant Clarence Backus testified that he purchased his property in 1942 and saw the stake that stands in the west line in 1947 or 1948. The manner in which he became familiar with the stake is worth noting. According to his account, he "was getting ready" to sell his timber to an individual by the name of Clinton Weaver, and thereupon the latter "loaned" to him two men by the names of James Stoop and Ray Kinney "to run a compass line from the southwest corner to the northwest corner." The purpose was, so

Backus swore, "to keep from getting onto O and C." The line was run with Backus' participation. In its course "we found this stake setting over west of the blazed line," according to him. We have mentioned the fact that the stake stands a few feet west of the west line. Backus added:

"Mr. Stoop had the field notes from the surveyor's office here in Douglas County, but he could find no signs adjoining this stake that might show a witness tree; * * *."

At the conclusion of the work, Stoop told Backus, so the latter swore, "Well, I can't make nothing else but just this line for you." Backus gave no other testimony upon that score. That was his introduction to the stake and the blazed line.

If Backus ever saw the witness tree that denotes the quarter section corner he did not mention the fact. He swore that he never recognized the blazed line "as the true line." He gave the following as his version of the conversation he had with Perini in 1952:

"I said that that blazed line would be recognized; not to cut anything north of that; that I did not want no trespass; that I didn't know actually where the true line was. There was no fixed stake denoting that a survey had been made.

In regard to his conversation with William Wooley, the following examination took place:

"Q You heard the testimony of the witness William Wooley and he stated that you took him out over your land, at which time he said that you stated to him that Harris owned all the timber north of that blazed line. Will you tell the Court whether or not you made that statement?

"A I made a statement like that. Beyond that blazed line, that we didn't cut beyond the blazed line; that that was recognized as property that belonged to Mr. Harris.

"Q You made that statement to Mr. Wooley. Is that correct?

"A That is right."

That testimony was given on direct examination. He added, however, that he did not know whether or not the blazed line was "the true line."

Concerning the conference which plaintiff Ben Harris swore he had in his home with defendant Clarence Backus after the latter had sold his timber to defendant Mast, the defendant, Clarence Backus, testified:

"I don't recall all of that conversation at his home; I remember having a conversation with him.

"Q Do you know what it was about?

"A It was with reference to Mast and Mr. Harris' son wanted to know when the Mast agreement was up, when it expired, but the total of the conversation I don't remember."

He said nothing further concerning the conversation.

As to the meeting in 1947 at the plaintiffs' mill, defendant Clarence Backus gave this account:

"Q * * * Do you recall that conversation in '47?

"A Not in detail but there was a portion of the conversation with reference to these axe marks on the trees.

"Q At the mill?

"A Above the mill.

"Q Well, did you, at the time in 1947, did you have any agreement with Mr. Harris that the blazed line was the true dividing line between your properties?

"A I never entered into any agreement as to a true dividing line. The blazed marks was used by both of us to designate a line that we wouldn't intrude or encroach upon one another. I never cut

north of the line and he wouldn't cut south of it, but, as far as a true property line, I never recognized it as such."

We believe that a conclusion is warranted that the several individuals above mentioned who were interested through the succeeding years in the two tracts of land were not certain that the blazed line was the true line. So far as we can ascertain, none of them knew who had blazed the line, and until the county surveyor performed his work after this suit was filed no one knew whether or not the blazed line represented the correct boundary. Very likely land values in that area were modest in 1911 and remained so through the years until the recent strong demand for sawlogs produced a new interest in stands of timber. When values become impressive, it is not unusual for owners to look to their title instruments and consult their "rights." But before the timber enhanced the land's value, the two stakes had been set and the line between them had been blazed. Like a river, road or fence, the blazed line afforded a ready boundary line. Further, it had about it the aura of authenticity. Arthur Woolley, who filed the homestead entry, accepted the blazed line as the southern boundary line of the tract. The succession of owners who bought or sold the property did the same. Those who owned the property now held by the defendants, before cutting timber from it, conferred with their neighbors to the north and then treated the blazed line as the boundary. Doubts as to its verity disappeared as with passing time minds met and accepted the line as the boundary. When the timber was cut to the south of the line, but all remained standing to the north, the line took upon itself a new significance. The practical acceptance of the line in that manner could not escape notice. In

the meantime, the plaintiffs developed their spring of water and installed their pipes. Thus, their occupation of the disputed area became more pronounced. A fact which we have so far left unmentioned is that each owner, pursuant to requirements, provided fire protection for his land.

The defendant, Clarence Backus, is the only one who testified that he questioned the accuracy of the blazed line and regarded it as tentative only, yet he had less occasion than the others to doubt its correctness. It will be recalled that he discovered it as the result of the work of two men who, presumably, were surveyors and with whom he worked in running the "compass line." As their work drew to a close, one of them told him, "Well, I can't make nothing else but just this line for you." Nothing more was said. The stake and the blazed line had been discovered. The men gathered their tools together and thereupon no further efforts were put forth. Again, in their timber cutting and in their several attempts to find loggers who would relog, the defendants, whatever may have been their unspoken views, accepted and respected the blazed line. We think that the evidence shows that for forty years or more the parties deemed the blazed line as the true marker and as permanent in character.

The trial judge, who gave alert attention to the development of the facts, entered findings upon which we will depend for a portrayal of the remainder of the evidence. They read:

"* * * That during the entire period aforesaid plaintiffs and the parties under whom they claim title and possession and during all of said time respected a corner established at and near the North and South center line on the west line of said Section 34 and a line drawn therefrom easterly to the center of said section, which has been blazed

by agreement of the predecessors in interest of the plaintiffs, and the defendants Clarence C. Backus and Walter T. Backus, which said blazed line has been recognized and acquiesced in and agreed to as the south line of the plaintiffs' land aforesaid and the north line of the defendants' Clarence C. Backus and Walter T. Backus line aforesaid, and has never been disputed and has been respected by the plaintiffs and the aforesaid defendants for more than ten (10) years prior thereto, to-wit: C. Backus and Walter T. Backus have cut timber to the said line and have respected said line and that said line was established by mutual agreement and has been acquiesced in ever since on or about the year 1912 by the respective parties and their predecessors in interest. That plaintiffs and their predecessors in interest have developed a spring and installed a water system located approximately 30 feet north of said aforementioned tree line and openly, notoriously, adversely and continuously used the same for more than ten (10) years.

"That the defendants Clarence C. Backus and Nellie Backus, husband and wife, Walter T. Backus, a single person, and Reuben H. Mast have no estate, interest, or lien therein adverse to the plaintiffs and that the claims of said defendants and each of defendants are without any right, title, interest, estate or lien to said premises in any manner whatsoever."

The issue between the parties as above disclosed is not a stranger to this court. It has been here several times before and this court has given attention to the principle of law which governs the issue: *Satchell v. Dunsmoor*, 179 Or 463, 172 P2d 826; *Kingsley v. Jacobs*, 174 Or 514, 149 P2d 950; *Kincaid v. Peterson*, 135 Or 619, 297 P 833; *Cooley v. Henderson*, 112 Or 258, 228 P 923; *Ogilvie v. Stackland*, 92 Or 352, 179 P 669; *Thiessen v. Worthington*, 41 Or 145, 68 P 424; *Lennox v. Hendricks*, 11 Or 33, 4 P 515.

An excellent dissertation upon our prior holding appears in Note and Comment, 28 Or L Rev 362. There it is stated

"It is submitted that the best explanation is simply to say that for strong policy reasons the parol boundary agreement constitutes an exception to the Statute of Frauds. Spiteful and vexatious litigation often grows out of uncertain boundaries. Peace in the neighborhood is better preserved by giving legal recognition to boundaries mutually agreed on and acquiesced in. The Statute of Frauds was designed to reduce the opportunity for fraud. Because of the many requirements which an enforceable parol boundary agreement must fulfill, the opportunity for fraud has been increased but little if at all. If the peaceable settlement of boundary disputes can be promoted without noticeably increasing the danger of fraud, there should be no objection to considering the doctrine of parol boundary agreements as an exception to the Statute of Frauds. In effect the courts have made the doctrine an exception, although they have not labeled it as such. It would not be a unique development of the law to label this doctrine as an exception to the Statute of Frauds, for the ownership of land can also change without a writing by adverse possession or estoppel.

\* \* \*

"Several Oregon cases deal with the doctrine of parol boundary agreements. The Statute of Frauds problem is disposed of by using the fiction offered by most courts; viz., that the parties take title, not from the agreement, but from their deeds as interpreted by their agreement.

"Oregon appears to have taken the liberal view with respect to the extent of uncertainty that must exist prior to the agreement. In *Thiessen v. Worthington* it was only required that the agreement be a settlement of 'a disputed boundary, *or* one that is uncertain *or* unascertained.' In *Kincaid v. Peterson* it was only required that the agreement grow

out of a 'disputed, indefinite, *or* uncertain boundary.'
\* \* \*

"Although occupation under the boundary agreement is apparently required in Oregon, it cannot be determined whether occupation for the ten-year statute-of-limitations period for the bringing of an action of ejectment is necessary. The cases in which boundary agreement were held valid without resort to the doctrines of adverse possession or estoppel were all cases in which occupation took place for more than ten years, and they did not pronounce a rule with respect to the length of occupation required. In no Oregon case has validity been denied to a parol boundary agreement because occupation and acquiescence took place for less than ten years;
\* \* \*"

Restatement of the Law, Contracts, § 196, treats the above principle of law in this way:

"An oral agreement between owners of adjoining tracts of land fixing a dividing boundary the location of which was honestly disputed, ceases to be within Class IV of § 178, and becomes enforceable when the agreed boundary has been marked or has been recognized in the subsequent use of the tracts, or when other action has been taken by either party in reliance on the agreement."

As is indicated in previous paragraphs, we think that the predecessors in interest of the parties, after deeming uncertain the true location of the boundary line, terminated the uncertainty by agreeing informally or impliedly upon the blazed line. If it be argued that the evidence does not show that they came together, agreed expressly, and, having done so, shook hands, it nevertheless shows, according to our belief, that they agreed impliedly. The following is taken from Tiffany, Real Property, 3d Ed, § 654:

"It has been frequently decided that though there is no express agreement as to the location

of the boundary line, adjoining proprietors cannot question a line which they have, for a considerable number of years, recognized as the correct line between their properties. Some of the cases base this doctrine upon the theory that such recognition of or 'acquiescence' in a certain line is conclusive of the existence of an agreement, while others seem rather to regard it as an independent rule of law, dictated by general considerations of justice and expediency, in order that uncertainty and disturbance of boundaries be avoided, and that mutual mistake does not affect the application of the doctrine of acquiescence. In some states, such acquiescence in or recognition of a line as the boundary is merely evidence tending to show that it is such, which may be contradicted.

"The requirement that the true line be not known and that there be a dispute as to its location, noted above with regard to express agreements, applies with equal force where it is sought to establish the boundary line by implied agreement or acquiescence."

See, to like effect, 11 CJS, Boundaries, p 636, § 64(a).

Although the predecessors in title of the plaintiffs and the defendants agreed upon the blazed line in an informal manner only, they nevertheless dealt with their respective properties and the blazed line in such a manner that they indicated that they had reached an accord; that is, in cutting their timber they did not go beyond the blazed line. If a tree that had been blazed stood beyond the line, it was not felled; the blazes were thus preserved.

We need not in this case determine whether or not the defendants should be deemed bound by the agreement which their predecessors in title formed, for it is clear from the evidence reviewed in preceding paragraphs that they agreed expressly with the plaintiffs

that the blazed line should be their boundary line. Further, we believe that the record discloses that the line was accepted, not as a tentative or temporary one, but as a permanent line. The authorities cited in preceding paragraphs support these views.

The challenged decree is affirmed.